COURT OF APPEALS
DECISION
DATED AND FILED

August 18, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP342-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2016CF1981**

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

  V.

PAUL N. WESTLEY,

      DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: JEFFREY A. WAGNER, Judge. *Affirmed*.

Before Brash, P.J., Dugan and Donald, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Paul N. Westley appeals a judgment of conviction, following a jury trial, of one count of second-degree sexual assault of a child under the age of sixteen.   Westley contends that the trial court erroneously admitted improper hearsay statements and unqualified expert testimony.   Because we conclude that any errors committed by the trial court were harmless, we affirm.

## BACKGROUND

¶2    On May 8, 2016, Westley was charged with one count of second-degree sexual assault of a child under the age of sixteen.   According to the criminal complaint, Westley told his twelve-year-old step-daughter, S.J., to remove her clothes so that he could teach her "what boys are not supposed to do."   The complaint states that Westley placed his finger inside S.J.'s vagina, rubbed her nipple, and placed her hand inside his shorts.

¶3    The matter proceeded to trial where multiple witnesses testified, including, G.C. (S.J.'s mother), S.J., Officer Joan Mueller, and Westley.

¶4    G.C. testified that she and Westley had been in a relationship for three years, during which they were married for one year.   G.C. testified that on the evening of May 4, 2016, she told S.J. that she and Westley were planning to divorce and that Westley would no longer be living with them.   Approximately fifteen minutes later, S.J. gave G.C. a hand-written letter detailing the assault.   G.C. testified that Westley had left for the evening and was going to return the following morning, at which point G.C. planned to call the police so that Westley would be present when police arrived.  G.C. testified that the following morning, she went to the police station and reported Westley.

¶5      G.C. testified that after Westley's arrest, she visited him at the county jail to collect rent money. Westley wanted to see her so that he could "explain everything to [her]." The conversation was video recorded and played for the jury. During the recorded conversation, G.C. told Westley that S.J. would not lie and make up the sexual assault allegation. Westley responded that he had no memory of the assault and that he smoked something that affected his recollection. G.C. told Westley that regardless of whether he remembered the assault, the incident occurred. Westley responded, "I know [S.J.] will forgive me," and "[t]ell [S.J.] I am so sorry."

¶6      G.C. denied helping S.J. write the letter in which she accused Westley of assault, but acknowledged that S.J. did not treat Westley differently after the assault. G.C. stated that S.J. never had a "sexual assault forensic exam[.]"

¶7      S.J., thirteen years old at the time of trial, testified about the events leading up to the assault. S.J. testified that on the day of the assault, Westley took her to a dentist appointment and that after he brought her home from the appointment he told her that "a cheerleading spot [] was open" and that he needed to record her doing a cheer. S.J. testified that Westley told her to change into Spanx under a cheerleading outfit and to practice a cheer. S.J. stated that she did not have a cheerleading outfit so she changed into Spanx and a t-shirt and did some cheers. S.J. stated that after she did the cheers, Westley told S.J. to sit by him so they could talk. S.J. said that when she sat by Westley, "[h]e was saying that when I was in the shower, that he saw me shaking my butt or twerking. And he was, like, why are you doing that?" S.J. said that she did not do so, but that she said "yes" because she was "scared that he was going to still tell me I saw you. So I said yes. And that's the feeling I had." S.J. said that Westley then told her to "demonstrate" and told her to take her clothes off while doing so. S.J. stated that she complied because she was

3

scared. S.J. told the jury Westley told her to sit next to him while naked. He asked her if she had ever kissed someone. When questioned whether Westley touched her, S.J. said, "He touched me on my breast. And he was touching me by my vagina." She testified that he also touched "inside" her vagina with his hand. S.J. explained that she felt something on her vagina. When asked whether she felt something "go inside" her vagina, she said "[n]o." She then clarified that she could not remember whether anything went inside her vagina.

¶8     S.J. further testified that while Westley was touching her, he asked her, "Should a boy do this to you?" She "kept saying no." Westley told S.J. "not to tell [her] mom any of this." Afterward, she went to the bathroom to get dressed. She testified that she felt that what happened was wrong, but she was not sure. She then joined her brother in the back room to watch television. S.J. testified that she was too scared to tell anyone what happened to her, but that when she found out her mother and Westley were divorcing and Westley would no longer be living with them, she felt "[Westley] wouldn't be able to do anything to me." S.J. then wrote her mother a letter, which S.J. read to the jury:

> This happened March 18, 2016. I didn't want to tell you because I was scared.
>
> While [A.J.] was in the back room my Dad told me to come in the front room with my [Spanx] on [and] a t-shirt and affter [sic] that he told me he saw me twerking in the bathroom but I really wasn't so he told me to get naked and he had kept asking me if I was comftorable [sic] I said yes because I was scared he had poked me in my privat [sic] and rubbed on my nipple.
>
> I hope Im [sic] not in trouble for this.

S.J. clarified that "poking" meant that Westley used his hand to touch her vagina.

4

¶9      On cross-examination, defense counsel asked S.J. whether she told "Officer Mueller that Mr. Westley placed one finger inside your vagina?"  S.J. responded, "I think so, yes."  The following exchange then occurred:

> [Defense counsel]: Now, that's a little different than you testified here today, correct?
>
> [S.J.]: Yes.
>
> [Defense counsel]: And in fact, today, you said that he touched you -- at one point you said he touched you by your vagina, correct?
>
> [S.J.]: Correct.
>
> [Defense counsel]: So today, are you telling us that you're not sure that he actually touched your vagina?
>
> [S.J.]: In the beginning, I didn't, like, wasn't sure.  But when I was -- when I said Detective Mueller, then I -- it came to, like, I came familiar with it.
>
> [Defense counsel]: So in the beginning you weren't sure he touched you in that area, correct?
>
> [S.J.]: Yes.

S.J. also denied that her mother told her to write the letter accusing Westley.

¶10      Officer Mueller testified about her training and experience in dealing with child sexual assault victims.  Mueller told the jury that she received specialized training for "child abuse investigation, sexual abuse investigation," "forensic interviewing," and "human trafficking investigations."  Mueller testified that she did not consider herself an expert witness, but that she "learn[ed] about how to investigate jury trials [involving] children and sexual maltreatment to children" and that she performed between 130 to 150 forensic interviews of children.

¶11      Over a series of overruled objections as to relevance and foundation, Mueller testified about the reactive behavior of victims during forensic interviews,

telling the jury that "every interview is different. Every child reacts differently. There is no one specific way that a child is supposed to act during an interview." Mueller also testified that she has experience dealing with victims' "delayed disclosures," in which "kids don't report that they've been a victim of a crime right away." Over defense counsel's objections as to relevance and foundation, Mueller told the jury that child victims generally have numerous reasons for not disclosing crimes and that victims are more comfortable reporting abuse when they feel as though the threat is removed.

¶12     Mueller also testified about her interview with S.J., telling the jury that S.J.'s testimony at trial was overall consistent with the information S.J. relayed in the interview, with some differences. Over defense counsel's hearsay objection, Mueller told the jury that during her interview, S.J. stated that Westley "put his finger in her vagina," and that Westley "took [S.J.'s] hand and placed it on his penis." Mueller stated that S.J. reported that Westley's penis "felt like a hotdog." Over defense counsel's objection to relevance and foundation, Mueller told the jury that "through experience [she's learned] sometimes their stories change a little bit" and that victims' memories tend to be better closer to the events they are asked to recall. Mueller also told the jury, however, that she has "had experiences where people have said something that has happened to them and we've come to find out that it hadn't."

¶13     Westley testified in his own defense, telling the jury that he did not: tell S.J. to dress in a certain fashion, talk about twerking, tell S.J. to remove her clothes, or sexually assault S.J. in any way. Westley testified that he told G.C. he did not remember what happened on the day of the alleged assault because he did not want to call S.J. a liar and he wanted to repair his marriage to G.C. On cross-examination, Westley admitted to telling G.C. during the jail visit that he "smoked

6

some weed and some dab" and did not know what happened with S.J. However, Westley also claimed that he was referring to a different time that he "smoked some weed and some dab[.]" When asked, "[Y]es or no, Mr. Westley, you lied to [G.C.] when you told her 'Something happened, I don't know what it was,'" Westley said, "Yes, I did."

¶14    At the close of the testimony, the trial court instructed the jury on the meaning of second-degree sexual assault by sexual contact, not by sexual intercourse. It specified, "Sexual contact is an intentional touching of the vagina of ... S.J. by the defendant. The touching may be of the vagina directly or may be through the clothing. The touching may be done by any body part or by any object, but it must be an intentional touching."

¶15    The jury found Westley guilty as charged. The trial court sentenced Westley to six years' initial confinement and six years' extended supervision. This appeal follows.

## DISCUSSION

¶16    On appeal, Westley contends that the trial court erred in admitting Mueller's testimony that S.J. told her that Westley put his finger in her (S.J.'s) vagina and placed her hand on his penis because the testimony was inadmissible hearsay. Westley also contends that Mueller should not have "been permitted to provide expert opinions about the behavior of child sex assault victims. The [S]tate did not give notice that it would be introducing Officer Mueller as an expert, Officer Mueller was not qualified as an expert, and the jury was not instructed that she was an expert." We conclude that any errors committed by the trial court were harmless.

**Hearsay**

¶17 Westley contends that "Mueller's testimony was impermissible because there is no exception to hearsay that permitted the introduction of her testimony relating S.J.'s out-of-court statements." Specifically, Westley contends Mueller's testimony that S.J. told Mueller that Westley put his finger in S.J.'s vagina and placed S.J.'s hand on his penis was inadmissible hearsay. The State does not dispute that the testimony may have been inadmissible hearsay, but contends that if the testimony was erroneously admitted, the admission was harmless error. Instead of analyzing the challenged statements under the rules of evidence, we, like the State, assume for the sake of brevity that the challenged statements were inadmissible hearsay. A hearsay statement that was erroneously admitted is subject to a harmless error analysis. *State v. Britt*, 203 Wis. 2d 25, 41, 553 N.W.2d 528 (Ct. App. 1996). "Generally, an error is harmless if there is no reasonable possibility that it contributed to the conviction." *State v. Tulley*, 2001 WI App 236, ¶7, 248 Wis. 2d 505, 635 N.W.2d 807. A reasonable possibility is "one sufficient to undermine confidence in the outcome of the proceeding." *Id.* "In making this determination, we weigh the effect of the inadmissible evidence against the totality of the credible evidence supporting the verdict." *Britt*, 203 Wis. 2d at 41. "The burden of proof is on the beneficiary of the error to establish that the error was not prejudicial." *Tulley*, 248 Wis. 2d 505, ¶7.

¶18 While the State puts forth multiple reasons as to why the admission of Mueller's testimony was harmless, upon reviewing the credible evidence against Westley presented at trial, we conclude that the evidence is sufficient to support the verdict against Westley without the allegedly inadmissible statements. *See Britt*, 203 Wis. 2d at 41. S.J. testified, in detail, about the assault, her fear of reporting the assault, and the letter that she wrote to her mother. G.C. testified about how she

found out about the assault, the letter S.J. wrote, her conversation with Westley in which he claimed he was sorry and knew S.J. would forgive him, and S.J.'s relief when she learned Westley would no longer be living with her family. The jury also heard the recorded conversation between G.C. and Westley in which Westley claimed he was high on the day of the incident and did not remember anything after he "smoked some weed and some dab." Mueller testified that S.J.'s testimony was generally consistent with S.J.'s interview statements. Even without the challenged testimony, the evidence supports the jury's verdict. Therefore, we conclude that the admission of those challenged statements did not affect the outcome. *See Tulley*, 248 Wis. 2d 505, ¶7. Accordingly, any error in admitting those statements was harmless. *See id.*

¶19 Moreover, the jury was not required to find that Westley put his finger in S.J.'s vagina or her hand on his penis. The jury was required to find intentional sexual touching. Even without the challenged testimony, the evidence supports the jury's finding.

**Expert Testimony**

¶20 Westley also contends that the State never sought to introduce Mueller as an expert witness at trial, yet Mueller "testif[ied] about matters in the province of experts[.]" Specifically, Mueller testified about the behavior of child sexual assault victims. The State contends that Westley forfeited this argument on appeal because Westley did not raise specific objections at trial; rather, Westley generally objected on the basis of relevance and foundation. Alternatively, the State argues that any error in admitting expert testimony was harmless. We agree.

¶21 At trial and over defense counsel's general objections, Mueller testified about forensic interviews, delayed disclosures, interfamilial abuse, and

reactive behaviors common among child abuse victims. Even without the challenged testimony, the jury still heard testimony from S.J., G.C., and Westley himself. Mueller also testified, as stated, that S.J.'s testimony was generally consistent with her forensic interview. The jury was free to disregard Westley's testimony in which he denied assaulting S.J. and to find the rest of the evidence, including the recorded conversation between G.C. and Westley, credible. The jury is the sole arbiter of credibility of witnesses, and it alone is charged with the duty of weighing the evidence. *See* ***State v. Poellinger***, 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990). Because the evidence, absent the challenged testimony, supports the jury's verdict, we conclude that any error in admitting Mueller's opinions was harmless.

¶22 For the forgoing reasons, we affirm the trial court.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2017-18).